The patent in suit, the Anderson patent, claims a stunt that consists of a cylindrical support means and projecting commissural supports. The accused COREVALVE device does not have these features. It's shaped like a chalice with widely varying diameters to keep it securely anchored. It doesn't say it's a cylinder, it says it's cylindrical. Well, that's right. In an international rectifier... It's an adjective which suggests that it has something resembling cylindrical characteristics, right? Well, no. It's a virtually identical term addressed in international rectifier, polygonal, where, again, there was no dispute over the meaning of polygon, just as there's no dispute over the meaning of cylinder here, and the question is whether... The word isn't cylinder, it's cylindrical. Yes, and the question is whether adding the suffix that turns it into an adjective broadens the scope. This court held in international rectifier that it did not, that you would expect the inventors to use a term like generally or substantially if they meant to broaden the term. And here we have a stronger argument than in international rectifier because the inventors used the term generally parallel to mean not perfectly parallel. If they had meant to mean not a perfect cylinder, they would have used a term like generally or substantially. Well, and then they also gave us figure 9, which shows a cylinder with more than one diameter in use. That's a preferred embodiment. We don't exclude preferred embodiments from claim meaning. Your Honor, the description in claim 1 is the prosthetic valve before it's implanted. Figure 9 is after it's implanted. It gets reduced and expanded. It goes through all kinds of permutations. But if you look at the claim language, it says a valve prosthesis for implantation in a body channel and collapsible for introduction within the body. And the valve may be collapsed. So it's talking about the stent before implantation. So figure 9 doesn't really bear on that. Furthermore, Your Honor, whether you agree with us that cylindrical refers to a constant diameter cylinder, which we think it does based on international rectifier. We think the European courts got it right as well. Remember, we're looking at this as one of skill in the art. How could you ever have something of constant diameter that is part of a human corrective entity, which is going to be twisting every time I move my body? Well, we're talking about what's claimed here. I'm not talking about geometric precision here. But it's in the infringement analysis where you can take into account de minimis deviations, manufacturing tolerances, apply the doctrine of equivalence. The question here is what is claimed. And they claim a cylindrical support means without modifying it with a term like substantially. Do you want that to mean constant along the longitudinal axis? Show me any place in the specification that uses those language, that language. Well, it doesn't use that language, but just as a claim that claims the circle. So you're importing limits. You're agreeing with that. When you claim a cylindrical device, you're claiming a shape with a constant diameter, just like when you claim a circle. You don't need to say it has 360 degrees because we all learned in high school geometry what a cylinder is or what a circle is. But even if the court doesn't agree, I think we need to look at the district court's construction of cylindrical, which was, you know, the court said without any reasoning that it means any shape relating to a cylinder. And I would submit that it's hard to see how that could be right, because how would the public or jury know the meets and bounds of relating to? The district court didn't say, and in fact, it allowed Edward's attorney to tell the jury that it means lots of things other than cylinders. So the jury really had no direction at all in terms of how close to a cylinder the device had to be. Certainly to the infringement issue, Your Honors. Deal a second with the Claim 8 language also, which talked about tubular. And if tubular were the used word, then there'd be more in support of your argument. But of course, claim differentiation would suggest then that cylindrical has a broader meaning than tubular. Well, I don't think so. I mean, a tube is a particular type of cylinder. That's why Claim 8 is dependent. And so if we're looking at Claim 1, it claims a cylindrical device. And again, there's no material difference between cylindrical here and polygonal in international rectifier. And again, if we're wrong about that, we think that... Is my cup or my pen cylindrical? A portion of it appears to be from here, Your Honor. Yeah, well, see, that's the problem. And the other problem is we put this in context, and it's the human body, which is... Nothing is perfectly geometric in the human body. No, but we're talking about a cylindrical device. Before it's implanted in the body, it gets collapsed so that it can fit into an artery and then expands. And when it's implanted, it will not necessarily be perfectly cylindrical. But we're talking about what's claimed before implantation. But I think my point is that I've looked a lot through the record for what one of skill in the art would think. But I think one of skill in the art would recognize when you're dealing with devices that are implantable in the body, cylindrical is not a 360-degree circle. Your Honor, I would just refer you to column five of the patent, lines 25, where it's talking there about a stent, and it distinguishes a substantially cylindrical stent, which doesn't have projections, what it calls projecting emphasis, from an exclusively cylindrical stent, which does. And in claim one, there was no need to make this distinction because it's talking only about the support means. And so since it doesn't have the projections, it would be exclusively cylindrical. There was no need to use those modifiers in claim one because it wasn't making this contrast. I'd like to move on to the infringement issue, if I may. We think that the court also erred by allowing the infringement verdict to stand without proof that the core valve device meets the projecting form limitation in claim one. Now the district court said we were trying to reopen claim construction on this issue, but that's not true at all. We have no quarrel with the plain meaning of projecting. Our appeal is based on lack of evidence. If you look at the core valve device, it doesn't have the projecting posts that are depicted in all the claims embodiments of the Anderson patent, figures one through ten. They had Dr. Buehler testify in regard to this issue, so they don't need much. I mean, they've got a jury verdict of infringement here. Why is his testimony? That was their only evidence that we have projecting conventional support. But any evidence is enough to support a jury verdict. Well, let me show you why. It doesn't have to be. Let me explain why there wasn't even any evidence here. Oh, he's got his fork analogy. What's wrong with that? Well, that's for the parallel point. Before we get to that, let me deal with the projections. His only evidence there was to draw a blue box around some of the rows of diamonds at the bottom of our device, and he pronounced that the cylindrical support means, and then drew green lines to the top of the device and pronounced that the commissural support. But this is a classic Ipsy Dixit. He didn't explain why those diamonds boxed in blue rather than others support the valve or why columns extending to the top of the device, how they could support commissural valve attachment points in the middle of the device. In other words, these are both supports, and so you would expect at least a rudimentary analysis of how these supports provide support. Instead, we just have— Did they provide expert opinion or whatever that that was how they resolved their commissural support limitation in the claim? He just stated that the columns going all the way up to the top were commissural supports, but he did not explain at all how they support the commissural points, the valve attachment points. And without at least a basic explanation, there's really no evidence here. It's just a bald assertion. Now, when he was confronted with some of these objections on cross-examination, Dr. Buller kind of shifted his theory to say that all the diamonds in the core valve device, what he called the whole structure of the stent top to bottom, supports the commissural points. But it would make the whole stent the commissural support, and as this court said analogously in Beckton-Dickinson, a stent can't project from itself. Just as the language in Beckton-Dickinson connected to taught separate structural elements that couldn't be met by a single element device, here the language projecting from plays the same kind of role and requires that there be two separate elements as opposed to the integrated device that we have at core valve. On the generally parallel point, it's undisputed that the commissural points on the core valve device are in the middle at the waist, and it's on the sloping waist that angles 30 degrees away from the longitudinal axis. So anything that supports those points has to run along that same angle and can't run generally parallel. So to counter that obvious problem... Generally. Generally is the word. Generally is the word, which means it doesn't... The jury found it was generally. How do we get around that? Because the only evidence that it was generally parallel, despite the problem of 30 degrees, which appears to be far more than generally, came with this fork analogy. But the problem was that it depended on the commissural supports going all the way up to the top of the stent, again without any suggestion as to how those supports at the top support the points in the middle. And so again, it's just a bare analogy without support, which we submit is insufficient to sustain the jury's verdict. Turning to enablement, your honors, this is not a veterinary patent. As one of the inventors, Dr. Hassenkamp, said, the goal was to create a valve that could be implanted in human beings. And yet nothing in the patent teaches how to overcome the obstacles specific to human implantation. Now, they did those pig experiments, but they were done surgically through the abdomen with a much larger prototype. But the difficulty with humans is that you have to shrink that stent so that it will fit into an artery and yet make it strong and stable enough to withstand all the pressures in the aorta. But again, you're confronting a jury verdict. And there was certainly testimony, particularly one skilled in the art here, the engineer plus the medical person, to support a finding of enablement, is there not? Well, it's actually undisputed that nobody could make this work for humans for many years. I'll get to how many in just a second. The question standard is whether it's undue experimentation, right? Well, whether it's undue experimentation, and this company called Stanford had an exclusive license for seven years. And this is Stanford University, very competent biomedical engineers. They couldn't make the Zanderson design work. And the big problem is the projecting supports. You know, if you make them thin enough to fit into the artery, they can't withstand the pressure. They couldn't make it work. Then PVT, which was the next licensee, couldn't make it work. Eventually, 12 years after the patent application was filed, Dr. Crevier, who was working for PVT, did succeed in implanting a valve in a human being. But not only is the 12-year duration evidence of non-enablement, but he was able to achieve that success only by discarding the Anderson design. He said that design was too weak and impossible to use in clinical practice. Not just difficult, but impossible. Now, his valve, the Crevier valve... Did he reject the design, or did he reject the invented claim? He rejected... They were worried about the claim, not particular devices. Well, he rejected the claim, and in his own patent, severely criticizes it as being impossible to use in clinical practice. And his valve was renamed the Sapien valve when Edwards acquired PVT. And Edwards asserts that the Sapien valve is based on the Anderson patent, but nobody so testified at trial. Whereas Dr. Crevier himself testified that he did not use the Anderson patent, the claim, the spec, any part of it, to develop the Sapien. So we submit that the evidence is clear and convincing that the Anderson patent was not enabled in 1990. And even today, 22 years later, it's never been enabled for human use. So it's really a classic case of non-enablement, and the jury had no reasonable... What has not been enabled for human use? The Anderson patent, nobody has... The infringing core valve seems to work pretty well. Well, the core valve device... You don't think it infringes, the jury does. So it fits within the language of the claims, and it saved, what, 10,000 lives in Europe? It saved 10,000 lives in Europe. So the invention's working pretty well. Well, both the core valve device and the Sapien device, neither one of them uses the key to this invention, which are these projections. And let me just mention that this... But it's pretty easy to see that you can extend the entire device up to encompass the projections, isn't it? The jury seems to think that's what happened. Well, there was no evidence... The projection becomes part of the device, but... No, there was no evidence of that. And I would just point out that the patent was initially rejected by the patent office for being obvious, and that the cure, the amendment, was to add projecting supports that are depicted in all the claimed embodiments as these posts, and nobody has ever been able to figure out how to make such a device work. And I'd like to reserve the remainder of my time. Well, you don't have any more time, but let's do this. Let's give you a couple minutes of rebuttal time back. And would you give Mr. Nathan an additional two minutes so that we can keep the time even? Certainly. Thank you, Mr. Strauss. Thank you, Your Honor, for that courtesy. On behalf of Edwards, I'd like to try to choose my time carefully because there are a lot of issues here I'd like to also get to the injunction. First of all, Your Honor, with respect to Figure 9, this question of it only being used, Figure 9 being after it's implanted, was only brought up in the yellow briefs, so we didn't have a chance to respond. This is your chance. And I will respond, Your Honor. This was brought up at the trial in a motion in limine, and on February 26, 2010, Chief Judge Sleet actually ruled that there is no temporal limitation in the claim and that the claim reads on the device sitting on a table free in air, it reads on the device when it's compressed in a catheter, and it reads on the device when it's put in the body. They accepted that ruling. They have not challenged it here on appeal. They've just ignored it. So the fact that the claim can be before, during, and after, so to speak, is clear, and that's the record and the law of the case up to now. Figure 9, as Your Honor has observed, shows how the device conforms to the body. It was uncontested at trial from Dr. Buller that the human body, as Your Honor points out, nobody has a perfect cylinder for any order or any other vessel like that. What does relating to a cylinder mean? What are the limitations on relating to a cylinder? It's the same kind of limitation that you would have, Your Honor, with respect to something that's substantially flat, like in the plate desk case. And I'd like to observe that Korbel itself proffered a definition where they said that it was pertaining to a cylinder. So the fact that it is relating to a cylinder tells the jury that that's exactly Is there a constant dynamiter, some sort of constant dynamiter anywhere? I guess it's not an answer for me that the other side proffered a similar definition. What are the parameters of relating to a cylinder? As in plate decks, Your Honor, the dividing line between relating to a cylinder and not relating to the cylinder is a question of fact for the jury. And in this case, the jury found that it was relating to the cylinder. And what the judge did, because frankly Korbel, if my math is right, seven times attacked this question of what cylindrical means and tried to get it limited down to just straight sides, just like a perfect cylinder, the judge gave special instructions in his final instruction to say it doesn't have to be a perfect cylinder. Now, where does it end and where does it become not relating to a cylinder? That's for the jury to decide. Well, isn't that sort of bringing up another question, which is, you know, claim construction, if the essence of what the jury is going to decide with respect to what a claim means involves relating to a cylinder. I mean, you're not suggesting that the jury really did the claim construction. The judge says relating to a cylinder. That's the definition. And the jury then gets to decide what relating means. Isn't that sort of throwing the claim construction issue to question the essence of the claim construction question to the jury? No, Your Honor, with respect, no, is my answer, because the judge went on to amplify his instruction over this barrage of attempts to try to get him to change his instruction. And he said in his final instruction, the term cylinder does not mean that the object described must be a cylinder with a diameter that is constant along its length or longitudinal axis. And he went on. This is the instruction to the jury. To put it another way, the term cylindrical, as used in the patent in this case, does not require the presence of a perfect geometric cylinder. Now, it's important to keep in mind, I understand this word chalice, and I've heard it for now four years. The point is that the cylindrical support means is only a part of their device. It's what Dr. Bullard drew as the blue box. That's all it is. It's not the upper part. It's not the part with the slopes. It's the bottom part. And Dr. Pinchuk, who was their engineering expert, testified at the trial and admitted that, and here's the question and the answer. Korbel's device has a stent, does it not? And I'm reading from A11563 to 65. Answer, yes, it does. Question, and it also has the cylindrical support means. Answer, yes. Dr. Pinchuk didn't have any trouble identifying a cylindrical support means in Korbel's device, just like Dr. Bullard had no trouble. It's the blue box, and that's it. And the fact that above the blue box, it then slopes out and then slopes in and so on, is irrelevant. One thing that is lost in this entire case, as far as Korbel is concerned, is that this is an elegant two-part invention. A two-part invention. It's a cylindrical support means, and it's a projecting commissural supports. That's it. That's all that's claimed. And they are two different things. And the blue box is the cylindrical support means in Korbel's device, and the projecting green column of cells above it are the projecting commissural supports. Now, I'd like to say something about this 30-degree business. There's no doubt that Korbel's device, the valve itself, attaches to the chalice part, if you want to call it that, at a point which is on the 30-degree slope. But that's not how the claim is built. The claim is constructed that the geometry is that the commissural supports are generally parallel. The claim doesn't say that you measure the geometry where the commissural points are. What the claim says is you look at the commissural supports, and they're the ones that are generally parallel. We've heard... Parallel to each other? Is that what you're saying? They are parallel, generally, all three. It's a plurality, but in reality it's three. All three are generally parallel to the longitudinal axis of the whole device. With the fork analogy, and I was there, I saw Dr. Bullard do it. He took the fork, and he pointed at the jury. He says, I'm pointing this fork. It has the tines and so on, or a curve and so on, but I'm pointing it at you, and it's pointing generally in a direction... I don't mean to be offensive here, Your Honor, but... So that makes it generally parallel? It does. Generally parallel to the axis of the whole device. And the fact that it goes in and out does not change that any bit at all. Now we've heard, and we heard again this morning, that there is structure above the points of attachment in the Corval device. Well, in Anderson Figure 2, there is structure above the points of attachment in his pervert embodiment. You can see that the commissural supports are element number four, but the commissural points are below, and shown below, in that device. So we would say that this is, frankly, yet another effort to try to redefine cylindrical. As the Chief Judge noted, the claim does not use the word cylinder, and it's very important... The spec does, though. The spec does. The abstract. I mean, it uses all kinds of other kinds of phrases besides cylindrical. It says cylinder-like, cylinder-shaped, the axis of the cylinder. So that's correct, right? That's correct, Your Honor. But what's important is that the claim as filed, when it came over from the European process, used the word cylinder. And Your Honor was honored to find that in the record at A-20458. The term cylinder-surface was actually in the claim as filed, and then it was amended and dropped out. But you're not suggesting that the references in the spec to cylinder-shaped and cylinder are talking about something other than the word in the claim, cylindrical, right? When I'm saying, Your Honor... They're one and the same, right? They are, Your Honor. And I'm saying that the specification gives repeated examples of why this is not a perfect cylinder. Not mentioned in counsel's argument is in column 2 and in column 6. There's expressed disclosure that the device has got to have a size and a largeness greater than the channel in which it's placed. And the reason for that is so it can conform to the channel. And of course the channel has got all kinds of different shapes, different people have built differently, and so on. And disease enters into it as well. We have figure 9. And perhaps most important is that the inventors, in their words, described the closest prior art, which was the Ross patent, actually patent application, and in the inventors' words, described it as a cylindrical stem. And when you go and look at Ross, and we've pictured it in the brief, it has curves, and in fact, Ross called it barrel-like. Now, the Anderson inventors disclosed in their spec that that's what cylindrical meant. It didn't mean this. It can include that. And that's the record that's available. So you have the claim having cylindrical at the start, sorry, cylinder, it was dropped. You have the references to figure 9. You have Ross. And you have the fact that the device has got to be greater than the channel in which it's built and placed. Now, let me say something about this question of the two separate parts in the Beckman-Dickinson case, because my time is very limited here. Yes, indeed, in Beckman-Dickinson, this court said that you cannot have the same part form two elements. Well, here, you have two different parts in Corvall's device, just like you have two different parts in the Anderson. You have the elegant two parts, the cylindrical support beams and the projecting commissural supports. The fact that they are hooked together doesn't mean they're not two discrete parts. If you look at figure 2 and figure 1, it shows the cylindrical support beams and the projecting commissural supports made out of the same wire. The inventors actually built it by hand, all out of the same wire. Their experts at trial said that was a unitary structure, just like Corvall's is a unitary structure. They say you can't overlap. Well, if you look at figure 1 and figure 2, the cylindrical support beams and the projecting supports overlap one another. So, everything that they say is different about the Corvall device is present in the specification as filed. I think I could use a little help. Do you have the blue brief? I do, yes. I'm looking at the picture on page 14. Yes, Your Honor. From what I understand, the central part, which is at the ionic valve annulus, that's the cylindrical element? Yes, Your Honor. That's a trial graphic that Corvall put together. That's the cylindrical. And then the expanded part, that is the counterpart of that unpronounceable word? Commissural. Projecting commissural supports. Okay. Yes, Your Honor. But what you're seeing here on page 14 is not the Corvall device. It's really more of an illustration. What I would direct my honor to for an actual picture is Dr. Buller's mark in the red brief on page 18. Sorry, is it 18? Page 18, Your Honor. And there's no secret about this. We asked Dr. Buller to get down from the stand and go to the LMO and actually construct these drawings for the jury. And what is here is an actual picture of the Corvall device sitting on a table free in air before implantation, before compression. And he labeled the various parts. That's where he drew the blue box, the cylindrical support means. And that's where he drew the green column of projecting commissural supports, which project in a direction generally parallel. Okay. So I would urge, Your Honor, in connection with looking at the device, to look at the actual one as opposed to the graphic that was there. Let me say something about enablement, because then I would like to get on to the injunction point. Yes, the inventors, with their own hands and a $50 budget, did this work in pigs. There's no doubt about that. There were videos displayed at the trial. It worked. They disclosed the pig experiments in their patent. Pigs died after five days, right? Your Honor, as a matter of ethics, you cannot allow the pig to continue to live. Oh, okay. It's just a matter of medical ethics. The point was, if they took them from the slaughterhouse, I don't mean to be too graphic here. That's okay. Thank you, Your Honor. But it worked. It was published. Dr. Groovey, who was their chief medical advisor for Corvall, described that the device had been successfully demonstrated in pigs. It's uncontested that pigs are used because the anatomy is closest to human beings. And so they say, well, look, but the device was too big. It wasn't enabled in human beings. The answer is that the patent says that a corresponding form can be used for humans. That's the word the patent points out. And that means the same magic two parts, the cylindrical support means and the projecting commissural supports. And all that was needed was to then reduce it in size so that it could be used in a human being. And Dr. Pinchuk testified that indeed it was within the skill of the art to reduce sense. And the inventors acknowledged, though, that before it could be considered for human use, there needed to be further extensive animal studies. Am I wrong about that testimony? No, you're not wrong about that, Your Honor. But the point is, the inventors had nobody to work with. The man of ordinary skill in the art, the person of ordinary skill in the art, postulated by their expert, Dr. Pinchuk, was a doctor working with medical device engineers. These doctors had nobody. How come it took 12 years for somebody to get it together? They lost three years to try to find an exclusive licensee. And by the way, it was not Stanford University, it was Stanford Surgical, who did absolutely nothing for three years. I'm sorry, it took them three years to find them. Stanford Surgical then became Hartford. And Hartford did nothing. It wasn't as though they were trying and failed. Dr. Anderson wrote a letter in 1995 to Hartford and said, and I'm quoting, I feel you are doing nothing. And then by just serendipity, Dr. Essigham, another co-inventor, actually was in San Francisco and made a pop visit to Hartford. He said, show me what you've done. Let me see your prototypes and so on. And they showed him nothing. And he testified about that. So you lost three years while they were trying to find somebody. Then they lost seven years while Hartford and Stanford Surgical had the rights and they did nothing. And then what happened? PVT came along, a start-up company. They were engineers. And within two years, they went from scratch to putting it in a human being called first in man in this industry in two years. And most important, Dr. Sagan, who was the president and the founder of Corabel, said, I had no idea how to do this. And then he got the 552 patent. And he marched off to Germany to a stent manufacturer called Avedis. This is all on the record. And said, build this. And they built it and they put it in a human being and it worked within six months. Let me say something about the injunction. Because obviously, the main focus of our cross-appeal, we submit there are two errors here, errors of law. Number one is that we have a completely circular argument.  don't enjoin us because we can move to Mexico. And the judge accepted that and three of the four eBay factors all talked about the fact that they can move to Mexico. And in a 28-J letter that was filed in this case by Corabel, they admit that the judge relied heavily on the fact that they could move to Mexico. Now, since they weren't enjoined, they say, well, we didn't move to Mexico because we weren't enjoined. So don't enjoin us because we can move and then we didn't move because we weren't enjoined. It's completely circular. It's catch-22. And the lesson of the case is if you're a big medical company or a big multinational company, all you have to do to beat an injunction and get a commercial license is to say, I can move offshore. Then there's no injunction and you stay put. And we now know for the first time in black and white in the yellow brief on page 46 that they have not moved. They are still in Irvine. They moved there because they needed to be near these medical device engineers. They needed that special facility that was available to them, the clean room and all that. And they needed this skilled workforce. That's why they came from France to Irvine in the first place. And having frankly tricked us and I believe fooled the judge, they're still there. And that's why we say that's an error of law. The law of this court has been under the Gore case that the cessation of infringement moving to Mexico is not a reason not to deny an injunction. Well, it's worse here. They never moved. And this is going on on a daily basis. Final thoughts, Mr. Nathan? Yes, one final thought also on the question of the error of the injunction is the fact that the judge clearly only focused on prospective irreparable harm. He said past irreparable harm doesn't qualify. If the court, I know the court has this in mind, if you look at the eBay decision, factor one talks about an irreparable harm which has been suffered. It's not prospective. You'll see in our briefs that we demonstrated on the papers that there was not only the past irreparable harm but also into the future. Thank you, Mr. Nathan. Thank you, Your Honor. Mr. Charles, these are competitors. That's right in the strike zone for an injunction, right? Well, what's very different here is that there are no infringing sales, just infringing manufacturer, and the judge analyzed the four eBay factors. That's, again, still in the strike zone. They're manufacturing. You're manufacturing. The same, right? Exactly what we seem to see is all of the justices would apparently have sustained that injunction. Well, the judge applied the four eBay factors. He found that they hadn't submitted anything. He didn't apply much of the public interest. That, I thought, would be a biggie, and I've read over and over he didn't invoke public interest. He invokes irreparable harm. Irreparable harm. This isn't a health and safety issue, is it? Well, he said they didn't submit any evidence on the adequacy of damages point. They just made attorney argument. On the public interest point, you're right. There wasn't a lot of analysis on that point, but as the appellee, we can make alternative grounds on that point, and there's a lot of evidence in the record that there would be a serious public health issue because Edwards cannot fill all the needs that the Corvallis device is currently serving, and so on that basis, we think there's an unusually compelling public interest argument, but on the irreparable harm point, the judge said that they offered only evidence of past harm, no compelling evidence of future harm, and the judge found that an injunction in these circumstances would be futile because Corvallis could simply be found based on evidence that Corvallis could move across to Mexico, and I can represent to the court that in order to avoid the damages that are piling up, Corvallis has moved 60% of its operations to Mexico and could easily move the rest if there were an injunction, so that an injunction would be futile in the circumstances the judge made a discretionary... Is there an ongoing royalty here? There's not. There's simply... Howdy, if you don't impose an injunction, don't you have to impose an ongoing royalty for the ongoing infringement? Well, they could seek that or they could seek further lost profit damages. Is it error to not do that, to acknowledge there's ongoing infringement and provide no remedy for it? Well, eBay said it's not automatic when there's ongoing infringement that you get an injunction, that the judges get a lot of... No, but the supposition is that there's some remedy for that infringement, right? Well, the remedy would be continued lost profit damages. They're going to get an accounting, which is going to amount to the hundreds of millions of dollars, and they can continue to seek lost profit damages or royalty. Is that a separate suit? After the accounting, it would be a separate suit or they could negotiate a license or negotiate a royalty. They have to bring another suit to bring this to a close? Well, the judge said that if he ordered the injunction, we would simply move to Mexico and nothing would change. So there was no point, in his view, in ordering an injunction under these circumstances. But when you don't order the injunction, don't you have to provide for the ongoing infringement? You say no. Well, no, what the judge said... Did the judge then endorse the ongoing infringement? No, the judge said that they could seek lost profit damages, negotiate a license, seek royalties. There's a number of options. Can I just address one point? You certainly may. On cylindrical, Judge Probst's question about relating to. In our opening brief, we offered that relating to a cylinder could include a sphere because they both have curved surfaces and diameters, or a triangular prism because they both have parallel bases and longitudinal axes. There was no kind of direction given to the jury here. So the jury could find virtually any shape to meet this claim term. And that defeats the notice purpose of claim terms. Relating to means virtually nothing. The reference to the Roth patent in the specification, the Roth patent itself does not describe its device as a cylinder or cylindrical. It never uses that language. It says it's the closest prior art, but if you read the reference in the Anderson spec to that, they're talking about the fact that it was an elastical stent, and so it was partly collapsible, but not fully collapsible because it had to be implanted by surgery. That would be an awfully obscure way to override the claim language calling for a cylindrical support means. Let me just say one word about the pigs. Again, the pig devices were implanted by surgery, not percutaneously through the skin into an artery. And so they could use a much larger device there. It wasn't just a matter of making it smaller, which engineers can do by using thinner wire and so forth. As Dr. Hassenkamp testified, if you made it smaller, that would solve the bulkiness problem, but exacerbate the stability problem. It wasn't just that the people at Stanford who were doctors from Stanford University who formed Stanford Surgical, it wasn't that they were lazy or unmotivated. They just couldn't solve the problem, and nobody has been able to solve the problem with projecting apices in this type of a device given the situation that they have to be implanted in. Thank you, Mr. Sorrell. Thank you. Our last case this morning is Ledergerber Medical versus Gore. All right. Excuse me. Did you wish to speak further, Mr. Nathan? Sorry. We've gone beyond all the times. I had reserved. You had reserved, and then we went beyond that. Let's give Mr. Nathan a minute to say a word. I just want to thank you, Your Honor, for the courtesy. I'm sorry I misunderstood the process. I just want to say that this is a game of catch-up. This is the first time we have heard about 60% of the production going to Mexico. What's said in the yellow brief is we never moved. Do you get an ongoing royalty here? No, Your Honor. What we get is to have to go back in the same case and go back. It can't be the same case. You have to have a final judgment. Yes, Your Honor, but it would have to be in the same case, and the point is there's no finality to this. There has to be some point where a company that is one-tenth the size of Medtronic, who hasn't got the kind of resources they have to keep litigating this thing, can have some finality. And I want to just make one final point, Your Honor, and that has to do with the protective order. They gamed the system with respect to the injunction, and they succeeded. And frankly, they gamed the system with respect to the protective order. I was not smart enough to be able to figure out that they would drop all their prior art defenses the night before trial and run to the patent office. And now they say that my colleagues and I who have spent years on this along with Dr. Bullard looking at this prior art cannot participate. We think it was an abuse and distraction not to reopen the protective order. There is a clause in there, paragraph 29, that allows that to happen to take into account the fact that this is just not frankly fair. And I would like to call that to your attention. Under the AIA Act, there's going to be more and more reexaminations. We all are aware of that. And what the lesson of the case is is just drop everything the night before trial, and then the trial counsel who happens to have worked on this and the expense cannot participate in the reexamination. That just is not fair. Thank you.